Whenever the council are ready, you may begin. Good morning. May it please the court, Jonathan Libby appearing on behalf of the appellant Latasha Arnt. Your honors, there are a number of issues we've raised in this case. So unless the court has any objections, my plan this morning is to first address the jury instruction issue. Then I'll get into a discussion on jurisdiction and the other issues under the statute. And if there's any time remaining, I'll get into the sentencing issues. So first, your honor, at a minimum, a new trial must be ordered here due to the district court's refusal to give a jury instruction on involuntary manslaughter as a lesser included offense of the murder charge. The law in the circuit is very clear. If there is any construction of the evidence that would rationally permit any juror to conclude that the killing was unintentional or accidental, then the court must give the instruction on involuntary manslaughter. And it is per se reversible error not to. Let me ask you about that, counsel. I suppose if I were the trial judge in this case, I would have given that instruction. The evidence is pretty thin for the instruction. I mean, not much there. Very thin. Here's my question. We keep saying in our cases over and over whether to give an instruction on a lesser included offense. We review for abuse of discretion. Now, one could think, you know, actually, if there's enough evidence there. It ought to be just go to a jury, period, which is what you just said. But our standard keeps saying it's abuse of discretion. How do we deal with that? What does abuse of discretion mean if, indeed, it must go to a jury? How do we deal with that, what looks like an anomaly to me? Well, Your Honor, I'm not sure that there is an abuse of discretion standard. Under Zuniga, this Court said that it is in fact per se reversible error, and failure to give it requires that a new trial be ordered. The other thing I would say is just pretend that that is the rule. If that is the standard, if you're going to deal with that, what's the standard? Pretend for a moment that there's a whole lot of Ninth Circuit authority that says and that that is the rule, that it's an abuse of discretion standard. Just pretend that. How would we deal with you know, just come into my world for a moment, you know, like I'm off in the Eleventh Circuit or whatever you want to call it. Pretend that. How do we deal with that? If that is the standard, how do we deal with that in this case? That's not a trick question. No, I understand, Your Honor. And I think you can find that it would have been an abuse of discretion because there is, while Your Honor described it as thin, I would disagree with that characterization. I believe there was certainly sufficient evidence here from which any juror could possibly have found that this was an accidental or unintentional act on Mrs. Arndt's part. She testified specifically that she wasn't aiming the knife anywhere. I got you. So whenever that's true, it's an abuse of discretion not to give it. Well, I think so. That would be my position. What does abuse of discretion mean, then? Discretion to do what? If it were abuse of discretion. Well, discretion to do what? The discretion here would have been to look at what took place. And I suppose the Court could say, well, if there is some evidence here, then I have to give it. If there's really nothing here, then I can't. It's not very discretionary. Well, it's perhaps not. And I think that's what the Court was talking about in the Zuniga case, that it's per se reversible error, that this is why you have to actually send it back. And, again, the evidence here was not thin. She testified that she wasn't aiming the knife anywhere. And if she wasn't aiming the knife anywhere and she, in fact, stabbed her husband, then that would suggest a lack of intent on her part, that this, in fact, was an accident. And certainly, based on what she also described as what was taking place, that her husband, who was unsteady on his feet, he was drunk, he had a blood alcohol content of 0.26, he had difficulty standing when he needed assistance when he came into the house. They were in the midst of a fight. She went into the kitchen to get away from him. He came in. She grabbed the knife. He then – and, by the way, there was a significant difference in their heights. Staff Sergeant Arendt was about a foot taller than his wife. He crouched down to take a swing at his wife, and she was holding the knife. And the next thing you know, she said the knife was in his chest. We had testimony from a forensic pathologist who said that that is certainly – that those events are consistent with the trajectory of the wound, that he, in fact, could have been falling over into the knife where she was holding it. That would certainly suggest that this was an accident, certainly unintentional. And if that's the case, then the instruction has to be given. And, therefore, at a minimum, as I said, there needs to be a new trial ordered here. And with that, Your Honor, I would move on to the issue of jurisdiction. And with respect to jurisdiction, Mrs. Arendt was charged under the Military Extraterritorial Jurisdiction Act, or MEJA for short. Under MEJA, in order for the government to establish extraterritorial jurisdiction, the government was obligated to both allege an indictment and prove at trial that Mrs. Arendt was actually residing with her husband at Incirlik Air Base in Turkey at the time of the offense. Nowhere in the indictment does it make any mention of the fact that she was residing in Turkey. But it does cite directly to the statute. Well, it cites directly to 3261A, which talks about the element being accompanying the armed forces outside the United States. The definition for that, however, does not appear in that statute. That appears in Section 3267, which does not appear on the face of the indictment. Now, let's look at what evidence came in. There was no objection to the indictment on that basis. That's correct. So let's look and see what evidence there was of residence. Well, Your Honor, again, the government introduced no direct evidence of residency. And what they rely on in terms of we had argued that there's insufficient evidence here, in fact, to even prove that element. What the government relies on is that, well, some of our witnesses made some reference to the fact that this was the Arendt's home. Did she herself testify that it was our house at one point? She did. And there were a couple instances where she referred to it as our house or our home, which would not be unusual because it did used to be her home. She had, in fact, resided there at one point. But for purposes of looking at the sufficiency of the evidence, we have to look at it in the light most favorable to the verdict. And couldn't a rational trier of fact view her references to our house as meaning that she still viewed it as her residence at the time? Well, I don't believe so, given the fact that there was a stipulation in the case that, in fact, her residence at the time of the offense, on the date of the offense, was actually in Riverside, California, not in Turkey. That's the stipulation that the government – The difference between domicile and residence, though, right? Well, that's certainly true.  But part of the whole thing was she came back and she was – one of the things she was mad about was that the nursery wasn't ready for the baby and the house was a mess. Well, that's right. And our position is that this certainly could have simply been a visit. And even if it were a visit, then Staff Sergeant Arndt would have made up a room for the baby to be in. But that doesn't necessarily – That's a permissible inference. My problem is that once we're looking at it on appeal, don't we have to draw the permissible inferences in favor of the verdict, which in this case would mean that the facts to which Judge Fletcher alludes could be additional evidence that she viewed it as where she intended to reside, because otherwise why would she worry about the state of the house and the absence of a nursery? Well, of course, there's also testimony that prior to the actual stabbing, she had already made a determination that she would be leaving, that she wasn't going to be staying much longer there. So certainly she didn't consider that that was going to be her residence. There was no suggestion of any permanence on her part. And that would certainly go against that. But if I could get back to – Before the military sent all the civilians home, she did reside there, no question about that, right? Yeah. Well, she, in fact, used to be a member of the Armed Forces. She was a member of the Air Force. She resided with him before they – she was a civilian at the time they sent her home, though, I believe. That's right. She was residing there at the time, right? That's correct. She – And when the military lifted the restriction on civilians, she came back. Is that right? She did go to Turkey at that time, sure. That's correct. Okay. Thank you. No, that's absolutely right. But she certainly, as our position is, that the evidence merely shows that she was taking a visit. There was no evidence put on by the government, certainly, to establish that that was her residence. But if I could get back to whether or not the government sufficiently alleged jurisdiction. And this is where – what I think is key. There was no jurisdiction in this case unless the government alleged the extraterritorial jurisdiction in the act. This is unlike simply an essential element of the offense, which in Cotton the Supreme Court said, well, that's not really jurisdictional. Here, in fact, we are dealing with something that is actually jurisdictional. The jurisdiction in this case lies under 3261, under MEJA. It does not lie under the traditional 3231, which establishes subject matter jurisdiction in the district courts. Therefore, it was absolutely necessary for the government to allege an essential jurisdictional element. The government. That would be a great argument if you had made it before you went to trial, et cetera. Well, I disagree, Your Honor. The government alleged that she was accompanying him, and it just takes a statute to look it up and say, what does accompanying mean? Well, listen. And you find out what it means. Is that true? Well, the statute does later under the entire act, it does later define what accompanying means. That's correct. Correct. So if the statute said member, I guess you don't have to attach a dictionary to the statute to say what a member is. So anyway, they said she accompanied him. Is that correct? It said that's correct. It used the words accompanying armed forces outside the United States. If that had somehow misled the defendant, that would be a great argument on appeal, something misleading about it. It's not quite so good an argument, is it, when it was not made before this? Well, I would submit that simply the language accompanying the armed forces outside the United States is misleading because it applies to numerous people that this act does not apply to. For example, reporters. Reporters embedded with troops overseas. They are not covered by this act because they do not meet the statutory definition of accompanying the armed forces outside the United States. Well, that's a nice theoretical argument. But what can you point to, if anything, in this record that demonstrates that she was confused about the basis? Well, whether or not she was confused just for the jurisdictional argument, the government is not excused from alleging an essential jurisdictional element in the offense. And for that, I would refer to Cotton, where Cotton, where it distinguished between what jurisdiction is, this is the type of jurisdiction that says is, in fact, really jurisdiction. It did allege jurisdiction. It said the word accompanying. Accompanying is what gives them jurisdiction. Well, accompanying, Your Honor, on its own does not explain what the elements are. I'm not talking about explaining it. I'm saying the word accompanying, how is that defined? How is accompanying defined? Accompanying for purposes of this case would be defined as dependent of a member of the armed forces. Well, how do I understand how you can say that it's confusing? I mean, that she might have thought she was an embedded reporter. It is further alleged that at the time of the offense, defendant was accompanying the armed forces outside the United States. Specifically, she was the dependent spouse of the decedent, who was then a member of the Air Force, et cetera. That's right. It alleged, interestingly, what the government alleged was one part of what accompanying the armed forces means. It did not list all of those elements of what accompanying the armed forces means. And, for example, the Perlaza case from earlier this year, which involved an indictment under the Maritime Drug Law Enforcement Act, where the indictment was dismissed, and I believe, Judge Fletcher, you were on that case. The indictment was dismissed because the government failed to allege an essential element, that being that the vessel on which the drugs were found was stateless. Well, the definition of that, it does not appear. It was dismissed on appeal, or it was dismissed by the district court? It was dismissed on appeal. But not by the district court? Not by the district court. It was reversed. Ten defendants, their convictions were reversed, and the indictment was ordered dismissed. Well, as I remember the case, there wasn't any evidence either in that case. So not only was it not alleged, but there wasn't evidence. Well, that's true. But the Court's analysis was in terms of whether or not the Court had jurisdiction to hear it in the first place because the government failed to allege this essential jurisdictional element in the indictment, which is what occurred here. It is an essential jurisdictional element. If the government could not establish each of these factors for accompanying the armed forces, then jurisdiction can't be found in a district court. And, Your Honor, with that, unless the Court has any additional questions on the issues involving the statute, I'll move to the sentencing issues, should you reach them. Your Honor, the sentence here was patently unreasonable. The Court imposed a sentence of eight years, even though the advisory guideline range was 57 to 71 months. The Court found numerous mitigating factors, including the fact that Mrs. Arndt was not likely to reoffend, that she had no prior criminal record, that she was remorseful. Essentially, this was an aberrant act on her part. She had an infant daughter. We also have in the case that she served in the military. The Court found virtually no aggravating factors here. The Court essentially said that she lied. The Court believed that she lied. That was his aggravating factor? That's right. The Court believed that she lied. Interestingly, though, not the Is that a proper aggravating factor? Well, it's not clear, Your Honor.  The Court didn't think she qualified for an obstruction of justice enhancement, based on that lying. It wasn't proposed. It wasn't in any way suggested. And even, by the way, if she had gotten the two-level obstruction of justice enhancement, her guideline range still would have been less than the eight-year sentence that she received here. The Court essentially said That the Court also talked about the seriousness of the offense. That's correct. What he believed was a just punishment and the need to deter others and engender respect for the law. Are those proper factors to consider? Those are proper factors to consider in context, though, here, essentially what the Court was doing was ignoring the Sentencing Commission's development of the sentencing guidelines. Essentially, the Court was ignoring the sentencing guidelines because, obviously, the sentencing guidelines. They're advisory now, aren't they? They are absolutely advisory. But the Court is still required to consider them and should consider everything that went into developing those guidelines. And certainly the most significant factor I would submit for a voluntary manslaughter conviction is the fact that somebody was killed. I mean, that's not just that. The Court basically said if this is voluntary manslaughter, it's horrible voluntary manslaughter because it's so close to being murder that I agree. The jury said that it's voluntary manslaughter, but this is really a horrible one. Incidentally, as you know, the Guideline Commission would now agree with the district court if it were today. That's true. That an eight-year sentence is a reasonable sentence for voluntary manslaughter. But, of course, that wasn't the case. I know it wasn't the case then. And it's not something that the Court even brought up. It's not something that had been suggested. It was not one of the reasons that the Court gave. No, no, no, no, no. I'm just saying that what the Court said was if this is the, you know, I've listened to this case and I've listened to the evidence, and if this is voluntary manslaughter, wow, this is a really bad voluntary manslaughter. And for that, I would submit that's a clearly erroneous finding, Your Honor. This was not a, there was nothing heinous about this act. It was a single stab wound that even if it was an intentional act, even if you rejected what the jury found, it's still a single stab wound. There was nothing particularly heinous about this crime. This was not some ridiculously harsh murder that took place here. It was in the course of a domestic dispute, a single stab wound struck her husband. And that was it. How this rises to the level of some type of heinous murder that would justify it. Well, this way, it rises this way. There are a lot of voluntary manslaughter that are brought on by very serious situations. The person's an abused spouse. He beats on her every day. And when I get up tomorrow, I'm going to beat you. There are all kinds of things like that that make something into a voluntary manslaughter. The court's saying here, look, I've listened to this evidence, and what I think is this guy came home, she was mad about his girlfriend, and she beat him over the head with a candlestick or whatever it was, and then stabbed him. That's what she did. And if she didn't actually stab him, she came awful close. Well, she certainly stabbed him. There's no question about that. But whether this rose to the level of some type of heinous almost murder, I would submit that's simply not justified on these facts, and therefore a sentence of eight years so far above the advisory guidelines range was simply unreasonable. And with that, I'll reserve the moment. We'll hear from the government. Good morning, Your Honors. May it please the Court, Jerry Benke for the United States. Counsel, let me start you out by telling you the issue that is of concern to me in this case, and that is the absence of an instruction on involuntary manslaughter. It appears to me that there was some evidence from which a rational jury could have found involuntary manslaughter as well as voluntary manslaughter. And in that circumstance, why isn't the defendant entitled to the benefit of that instruction? That's the end of the question. Oh, thank you. To begin with, I want to go back and address an issue that Judge Fernandez raised earlier, and that is that the standard that Your Honor just articulated is the standard that the district court applies in determining whether the jury instruction is warranted. On appeal, the standard of review that this court applies is abuse of discretion. How does that fit together? I mean, that's Judge Fernandez's question, because if the district court applied the standard that I described but applied it incorrectly, that is, said there is no evidence, when we look at the record and we say, yes, there was, why isn't that a legal error on the part of the district court? If the court simply does that, then the court is substituting its judgment plainly for the district court's judgment, and that's not abuse of discretion, Your Honor. If we don't, though, what we end up with is a defendant who was entitled to a lesser included instruction and didn't get it, why isn't that a bigger problem than fiddling around with the standard of review or the way that we used to describe it? Well, the standard of review, as articulated in the Roston case, is a highly deferential standard to the district court's determination. That doesn't answer the question. What happens to the defendant? We make nice to the district court judge, and we say, well, you made a mistake, but it's okay, but then the defendant never got the instruction to which she was entitled. Well, if the district court did not abuse its discretion, even though reasonable minds might differ on the evidence, if the district court didn't err to the extent that it amounts to abuse of discretion, then the defendant is stuck with the verdict. Well, let me put it another way. If we look at the record that the district court looked at and said there is evidence, the district court was just wrong when it said there wasn't any. Why isn't that an ‑‑ I mean, if you want to use your terminology, why isn't that an abuse of discretion to deprive a defendant of an instruction of a lesser included offense on a mistaken understanding of what the record contains? Well, on this record, Your Honor, the government agrees with the district court and does not believe that there was any evidence. Well, you're sliding away from my question. I understand that you don't agree with my reading of the record, but if it is correct, then why isn't it an abuse of discretion for the district court to make a mistake about whether the record contains facts entitling a defendant to an instruction? Whether it's a defense or a lesser included offense or whatever it may be, if the record supports it and the district court is wrong, why isn't that an abuse of discretion? Your Honor, if this court, in reviewing the record, is firmly convinced that the district court erred in judgment in determining that there was no evidence, then, according to Roston, that does amount to an abuse of discretion. Let me ask you. What does abuse of discretion mean, then? This court has explained that an abuse of discretion means that, in reviewing the evidence on appeal, this court has to determine whether, in its mind, it is firmly convinced that the district court committed an error of judgment. That standard is applied in a wide range of circumstances. For example, evidentiary determinations. Reasonable minds might differ on whether evidence should or should not have been admitted, but that is not the question. The question is whether, in making the decision that it did, did the district court abuse its discretion. Precisely, and that's easy. So you have a case like this where you have some evidence, something from which one could say that, oh, maybe it's involuntary manslaughter. You know, there's the guy who said, well, he could have been jumping forward and could have hit him by the knife, could have hit him when she was just waving it around. You know, that stuff. Now, you've got all the other stuff the district court talked about. You know, she apparently, she had no harm to her except a little injury on her pinky. His head had been battered with some kind of a thing, et cetera, et cetera. You've got all this other evidence, admittedly. But there's something. She says, well, you know, I was just sort of waving it around, and I remember everything distinctly except I blacked out at that very instant when the stabbing took place. I suddenly can't remember anything about the stabbing. I remember everything before it and I remember everything after it. I don't remember that. And he was drunk and her expert said, well, he could have lunged at her and that could have been it, et cetera. So there's some evidence. Okay? Now, you're going to tell us why it was not improper for the district court to refuse to give the instruction. But there's some evidence out there. Yes, Your Honor. Well, first of all, let me just reiterate. The government disagrees with the assessment that there was some evidence. The expert witness testifying about theories about how the victim could have suffered the fatal injury is not sufficient evidence to warrant the instruction. There was no evidence admitted about how the stabbing occurred in an accidental fashion. The defense did offer up this theory through the expert witness that the victim could have somehow lunged onto the knife, but that is completely contradicted by the actual evidence about how the stabbing occurred, which was presented by the defendant herself. The defendant testified not only, as Your Honor points out, that she remembered everything leading up to and everything after the stabbing, but does not remember the stabbing itself, which is essentially no evidence about how the stabbing occurred. But she also testified that, first of all, when she said that the victim crouched as though he was going to punch, that meant that he was bending his knees a little bit. She didn't remember him even bending forward at all. Right after the stabbing was completed, she testified that the defendant and the victim were both standing. Her testimony was that after she stabbed him, the victim was standing in front of him or excuse me, standing in front of her, and that she pulled the knife from his chest. Counsel, something that I have, I think we're all concerned about this case, but what the judge did was to disbelieve her. Now, was that not something for the jury to decide, not the judge? She testified that she didn't do this on purpose. She didn't mean to stab him. To the contrary, Your Honor, she never testified to that. Her testimony was, I didn't want to fight him. I wanted him to leave. She never testified that she didn't mean to stab him. She never testified that the stabbing was an accident. She simply said that she didn't remember how the stabbing occurred. She said some other things, that he was slapping her, and the judge disbelieved that. She said they were having a fight, and he disbelieved that. And in effect, she said that she didn't mean to do it. Well, but she didn't testify that she didn't mean to do it. She did testify that there was a fight leading up to this, and she did testify that the victim hit her several times, as Your Honor points out. And all of that testimony, even though the district court disbelieved her, is what justified the voluntary manslaughter instruction under a theory of provocation or imperfect self-defense. But nowhere in the record is there evidence that the stabbing was accidental or unintentional. In fact, her testimony on that point simply was she stabbed him, and that she did not recall how the stabbing occurred. Her inability to recall how the stabbing occurred is a lack of any evidence about how. I'm sorry. I hate to say it. I was looking at the notes that we have here. Didn't she say she didn't want to kill him? Didn't she say those words at ER 991? And didn't she, after the stabbing occurred, try to save his life? She telephoned for help after the stabbing occurred, yes, Your Honor. She talked with him, too, and said, hang on? Yes, Your Honor. During the telephone call, the telephone operator heard her saying, stay with me, baby. But, again, her statements about after the offense, her statements, stay with me, baby, and her other comments to that effect, while they demonstrate perhaps remorse over what she did, that itself is not sufficient evidence that the stabbing was accidental to warrant an instruction. In fact, in Ross's ---- What about her testimony that she didn't mean to kill him? Again, Your Honor, her testimony at trial that she didn't mean to kill him, excuse me, is not sufficient evidence to justify the involuntary manslaughter instruction. She might have meant to stab him in the chest, but not kill him, in other words. I'm sorry, Your Honor, I'm referring to her testimony. In other words, she might have meant to stab him in the chest, but she didn't mean to kill him. Yes, Your Honor, that is an interpretation of it. And at the end of the day, what we have here is evidence that she stabbed him not only in the chest, but she stabbed him directly in the heart with tremendous force. And this case is very analogous to the Roston case. In the Roston case, there was evidence of a physical altercation between the victim and the defendant. There was evidence that the victim and the defendant were not getting along leading up to the killing, and there was evidence, well, actually the victim died by going overboard on the ship and drowning. After the victim went overboard and drowned, the defendant called for help, just like the defendant did in this case. Now, in Roston, the defendant didn't testify at all, but in that case, the defendant argued for a lesser instruction on voluntary manslaughter on a provocation theory. The rationale that he offered was that there was evidence that a physical altercation occurred between the two, and a jury could possibly find that a physical fight between two people is adequate provocation to warrant a voluntary manslaughter instruction. This court, in deciding Roston, agreed with the defense that a physical altercation could possibly provide adequate provocation for voluntary manslaughter, but when the court looked at the record, it found that there was no evidence presented that it actually did result in provocation in that case. And the court, under the abuse of discretion standard, deferred to the district court's judgment on the state of the evidence. We have essentially the same scenario here. What the defendant is arguing is that this was an unintentional act. The only theory that she offers up on how this was an unintentional act is that perhaps the victim flung himself onto the knife. Perhaps the victim charged at her or lunged into her, the process of punching her, and impaled himself on the knife. But when you look at the trial record, there's no evidence that that occurred. The defense expert speculated about different ways that this injury could have been inflicted concerning the direction from which the knife may have come, but that is not evidence that that's actually how the stabbing occurred. The defendant testified that she didn't remember the stabbing itself. So there's no evidence about the stabbing occurring in any accidental fashion. And to the extent that their expert speculated that the victim might have flung himself onto the knife, there's no evidence that that occurred. And the evidence that is in the record directly contradicts that theory. Counsel, if we were to disagree with you on this issue, would we have to reach any of the other issues other than the jurisdictional issue? In other words, the sentencing issues and all of that would be? Yes, Your Honor. If the court disagrees and does find that the district court abused its discretion on that issue, then the government does agree that that provides basis for reversal and there isn't any need at this point to get to any of the other issues. The only remaining issue, as Your Honor points out, may be the jurisdictional issue. And on that point, the defense relies on Perlazza to try to fashion an argument that, given that this is a jurisdictional issue, the standard of review is somehow different. However, there are no cases to support that proposition. And, in fact, to the contrary, in United States v. James, this court did apply the same standard of review that it does in all other sufficiency of the indictment cases to a jurisdictional question. There, the crime occurred on an Indian reservation, and the defense challenged the sufficiency of the indictment on the jurisdictional issue concerning the victim and defendant being Indians and the crime occurring on the reservation. And the same standard of review applied there as it does in all other cases. Here, since the defense is raising the issue for the first time on appeal, the standard of review is plain error. And, first of all, as the government argues in its briefing, the government does not believe that there was any error at all. As Your Honors have pointed out, the jurisdictional element in this case is that the defendant was accompanying the armed forces, and the indictment does so allege. However, even if the court were to find that the indictment did not sufficiently allege all of the factors to establish accompanying the armed forces overseas, reversal on the sufficiency of the indictment is not warranted because there was no plain error. The defendant's rights, substantial rights, were not affected. Well, I think on a jurisdictional question, we don't really go to plain error. I see that the indictment can be cured by the evidence, but jurisdiction stands in a different context than cases where we look at plain error, I think. Well, in this case, Your Honor, the evidence did establish all of the jurisdictional elements. And, in fact, the jury ultimately found beyond a reasonable doubt all of the jurisdictional elements. So, as Your Honor points out, if there is any deficiency in the indictment itself, that is cured by the evidence and the jury's finding. On the restitution issue, that seems to be a little bit in question, as who's the victim under the Act and what they can recover. This Court has held, Your Honor, as cited in the briefs, that in a situation such as this where the victim is deceased and family members of the victim have to come forward and participate in the proceedings, essentially in the place of the victim, that it is appropriate to award restitution for lost wages. Well, they came to the trial, but they didn't participate in the proceedings, in that, other than just coming to the trial. There's some cases, I think, where they have helped with the investigation and done that kind of thing. But here I don't see any indication that they participated in the proceedings other than to attend the trial. Well, they did also testify at the sentencing proceedings. And part of the restitution award had to do both with their attendance at trial and also their attendance at the sentencing proceedings. Did they actually testify or just put in letters? No, they did actually testify, Your Honor, at the sentencing proceedings. But you're correct. They did not testify at the trial itself. They were merely present for the trial. This is kind of a mushy area. Unless the Court has questions about any other issues, I would submit on the briefing. Thank you. Thank you, Your Honor. Mr. Libby, I think you have half a minute or so. Thank you, Your Honor. On the involuntary manslaughter issue, the expert's testimony here, he was an expert testimony. His testimony was, in fact, evidence. And it also demonstrates a theory of what the evidence shows from which a juror could have concluded that this, in fact, was an accident. It was entirely consistent with Mrs. Arndt's testimony. That's where the theory came from. And if the expert could come up with a theory, then certainly a juror could have reached the same conclusion, that this, in fact, was an accident. And Mrs. Arndt, of course, did testify that she didn't want to kill him. She wasn't aiming the knife anywhere. And as far as she doesn't remember the stabbing, I would submit that doesn't necessarily mean that she had a blackout. It could mean that the stabbing occurred by accident, that she didn't remember the stabbing because the knife just went into the chest accidentally. And with that, I see my time has expired, and I thank the Court. Yes, it has. Thank you. The case is submitted. And we will take about a 10-minute recess before the final case. All rise for the final recess.
judges: B. Fletcher, Fernandez, Graber